UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

PAMELA RAYDER,

                        Plaintiff,

          -against-                           5:13-cv-0639 (LEK)

COMMISSIONER OF SOCIAL
SECURITY,

                        Defendant.

_____

## MEMORANDUM-DECISION and ORDER

## I.    INTRODUCTION

      This case has proceeded in accordance with General Order 18, which sets forth the procedures to be followed in appealing a denial of Social Security benefits. Both Parties have filed briefs. Dkt. Nos. 15 ("Plaintiff's Brief"); 20 ("Defendant's Brief"). For the following reasons, the judgment of the Social Security Administration ("SSA") is vacated and remanded for further proceedings consistent with this Memorandum-Decision and Order.

## II.    BACKGROUND

      Plaintiff Pamela Rayder ("Plaintiff") is currently fifty-two years old and claims that her medical condition bars her from all gainful work activity. See Dkt. No. 11 ("Record") at 165, 202.[1] Specifically, Plaintiff claims that she cannot concentrate, gets frequent headaches, has back pain and numbness, and has trouble bending at the waist and lifting heavy objects. R. at 202.

### A.  Medical Records

      Plaintiff has a high school education and worked as a utility person at a furniture factory

---

[1] Citations to the Record are to the pagination assigned by the SSA.

from 1999 until 2004. R. at 203, 207, 268. From 1989 to 1999, she worked as a cook at a casino and resort. Id. Plaintiff's injuries arose from a head injury she incurred on June 10, 2003, when she was pulling a cart at work and fell backwards. R. at 270. She struck her head on a concrete floor, and subsequently lost consciousness. Id. She was treated at Oneida hospital and discharged with instructions to take pain medication. Id. The emergency room told Plaintiff that she could return to work, however, Plaintiff's primary care physician, Dr. Jay Sullivan ("Dr. Sullivan"), instructed Plaintiff not to return to work. Id. Following the injury, Plaintiff sought treatment for back pain, neck pain, headaches, cognitive difficulties, diminished mental stamina, depression, and other physical and mental symptoms. See R. at 533-64.

Plaintiff returned to work in September 2003, despite persistent pain, fatigue, and cognitive problems. R. at 270. She was supposed to return for only half days at first, but her medical release did not contain any restrictions, so she resumed work full time. Id. Immediately, it became clear that Plaintiff was unable to resume her former duties, due to pain, fatigue, and cognitive difficulties, so her hours were reduced to four hours per day. Id. Plaintiff reported needing to work at a slower pace, getting confused and tired, and being in pain most of the day while at work. Id. Sometime in 2004, Plaintiff had a change of job duties at the furniture factory, and in August 2004, Sullivan recommended Plaintiff stop working and undergo further evaluation and treatment. R. at 268. Plaintiff's colleagues noticed both the mental and physical changes in her functioning after the accident. Id. She was laid off on August 20, 2004. R. at 294.

Dr. Sullivan was Plaintiff's treating primary physician from the time of the initial injury until

2

December 31, 2009. Pl.'s Br. at 4.[2] Dr. Sullivan observed that Plaintiff suffered from persistent headaches, severe cognitive impairment, fatigue, malaise, lethargy, disorientation, difficulty concentrating, anxiety, depression, and slow rambling speech. <u>See</u> R. at 533-64. He noted that the persistence of chronic headaches over a period of several years "impl[ied] permanence." R. at 533-34. Dr. Sullivan concluded that due to Plaintiff's cognitive delay and chronic headaches, she is not able to multitask and lacks the cognitive stamina to complete even half a work day. R. at 593, 597. He opined that Plaintiff showed no response to multiple stimulants, anti-depressants, and cognitive therapy for over a year, and he believed that in light of her cognitive limitations, she had a marked to total disability. R. at 598.

On September 2, 2003, Plaintiff was examined in connection with her workers' compensation claim by orthopedic surgeon Dr. Charles Totero ("Dr. Totero"). R. at 22. Dr. Totero concluded that Plaintiff could carry on normal work activities in a full-time capacity with no restrictions. <u>Id.</u> On October 14, 2004, Plaintiff was examined by Dr. Elliot Gross ("Dr. Gross"), a neurologist. R. at 293. He diagnosed her with cervical strain, symptoms of lumbar radiculopathy, and post concussion syndrome with depression. R. at 295. Dr. Gross concluded that Plaintiff could work full time without restriction, despite her ailments. R. at 296. On December 27, 2005, Plaintiff attended a psychiatric evaluation for workers' compensation purposes, conducted by Dr. Robert Seidenberg ("Dr. Seidenberg"). R. at 286. Dr. Seidenberg concluded that Plaintiff was psychiatrically able to return to light-duty work. R. at 290. On August 3, 2007, Plaintiff was again evaluated related to her workers' compensation case, by Dr. Patrick Hughes ("Dr. Hughes"), a

---

[2] Citations to the parties' briefs refer to the pagination assigned by the Court's Electronic Filing System ("ECF").

specialist in psychiatry and neurology.  Id.  Dr. Hughes concluded that Plaintiff could work with a twenty-pound lifting restriction and should not sit, stand, or walk for more than thirty minutes at a time.  Id.

In January 2004, Plaintiff had a neuropsychological evaluation with Dr. Bradshaw.  R. at 275.  He observed that Plaintiff had a slowed processing speed and some difficulties in learning.  R. at 279.  He found that she had relatively good attention, concentration, mental control, and working memory.  Id.  He found that Plaintiff suffered from mild to severe depression.  R. at 278.  Dr. Bradshaw concluded that a combination of head injury, depression, and pain were contributing to Plaintiff's difficulties.  R. at 279.  He opined that if Plaintiff's depression and pain management were successfully treated, her cognitive function may improve.  R. at 279-80.

Plaintiff joined a concussion management program in July 2004.  R. at 269.  Plaintiff reported post-concussion symptoms of headaches, forgetfulness, irritability, and other symptoms that worsen as the day wears on.  R. at 267-68.  She reported that she sleeps a lot, has very low energy, and finds it difficult to get out of bed in the morning.  R. at 268.  Plaintiff reported that medication has helped with her mood and she was less tearful.  R. at 265.  She has difficulty remembering to take her medication on a consistent basis and maintaining a routine.  R. at 267.  Plaintiff often loses or misplaces things and has trouble getting her son on the bus in the morning because she gets distracted.  R. at 265.  She continued to suffer from constant headaches, as well as short episodes of sharp, intense head pain.  R. at 265, 270.  She also reported neck and back pain which extends to her shoulders and legs.  R. at 270.  Plaintiff stated that she has vision problems including photophobia and sometimes feels like there is a film over her eyes.  Id.  She experiences dizziness if she moves too quickly and is bothered by noises and sound.  Id.  In the concussion

4

management program, Plaintiff had difficulty following the conversation and would often close her eyes and put her head in her hands. R. at 269. She had a delayed response to questions. Id. Plaintiff received occupational and physical therapy in the concussion management program. R. at 268. Plaintiff's treating physician at the concussion management program Dr. Brian Rieger ("Dr. Rieger") agreed with Dr. Sullivan's recommendation that Plaintiff stop working to focus on treatment. R. at 269.

On August 29, 2007, Plaintiff was evaluated by Dr. Dennis Noia ("Dr. Noia"), a licensed psychologist. R. at 476. Dr. Noia concluded that Plaintiff was capable of understanding and following simple directions, could perform mainly simple, but some complex tasks, and had some difficulty maintaining attention and concentration. R. at 476-78. He also observed that she had difficulty attending to a routine, maintaining a schedule, and dealing with stress. Id. Dr. Noia noted that Plaintiff appeared to be capable of learning new tasks, making appropriate decisions, and interacting and relating with others. Id.

An orthopedic exam was conducted on August 29, 2007 by Dr. Berton Shayevitz ("Dr. Shayevitz"), who concluded that Plaintiff had marked functional limitations as a result of her physical and mental disorders. R. at 482-83. Dr. Shayevitz diagnosed Plaintiff with post-concussion syndrome, degenerative disc disease in the low back, and post traumatic headaches. R. at 483. In Dr. Shayevitz's opinion, Plaintiff was "generally markedly limited in ability to function" in terms of cognitive impairments and moderately to markedly limited in her ability to lift, bend, push, and pull due to back pain. R. at 484. He also noted the additional limitation imposed by her persistent headaches. Id.

Dr. Thibault evaluated Plaintiff on September 17, 2009 and concluded that she suffered from

"severe psychomotor retardation" and recommended that she work no more than twenty hours per week. R. at 563-64. Dr. Thibault observed that Plaintiff had difficulty staying awake long enough to carry on a conversation, her long and short term memory were impaired, and she showed significant delay in answering questions or responding to commands. R. at 566.

Plaintiff complains of chronic headaches, which occur every day. R. at 221. Her primary care physician, Dr. Sullivan, manages the treatment of her headaches. Id. The pain is at the front, back, and left side of her head, and Plaintiff describes it as a 7-8 on a pain scale of 10. Id. The headaches cause Plaintiff's eyes to ache and induce nausea. Id. As a result, Plaintiff stays in bed most of the day. Id. Plaintiff currently takes Hyzaar for blood pressure, Lidoderm and Tylenol with codeine for pain management, Provigil to help with alertness, Prozac for depression, Ritalin to help her concentrate. R. at 206. Plaintiff reports significant trouble sleeping and stated that her condition causes her to toss and turn in different positions in her sleep and she often paces the length of her home during the night. R. at 210.

Plaintiff stated that she typically spends the day resting and visiting her daughters. Id. She listed "sleep" as her only interest and hobby. R. at 213. Prior to her accident, in addition to working, Plaintiff was able to garden and do lawn work, housework, and manage finances. R. at 210. Now her husband manages the finances. R. at 213. She stated that she bathes less frequently than she did before the accident and needs special reminders to take care of her personal needs and take her medication. R. at 210-11. Plaintiff attempts to fix her own meals, but stated that it takes her "forever" and she often forgets that she has "something going." R. at 211. Plaintiff is able to wash dishes and put laundry in the washer. R. at 212. Plaintiff has a driver's license, but only drives locally, per her eye doctor's instructions. Id.

6

### B. Procedural History

#### 1. 2009 Hearing

Plaintiff initially applied for Title II disability benefits on March 23, 2007. R. at 163-69. The SSA denied the claim. R. at 92-96. Plaintiff timely filed a Request for Hearing. R. at 99. An initial hearing was held by video conference in Syracuse, New York on July 27, 2009. R. at 74. Another hearing was held on September 3, 2009 in Chicago, Illinois. R. at 34. At the hearing, Plaintiff discussed her neck and back pain and concussion, as well as her depression and borderline intellectual functioning. R. at 39-40. She stated that these impairments impact her ability to stand, walk, sit, lift, carry things, remember things, and her concentration. R. at 39-40, 46-50. Plaintiff emphasized how frequent and debilitating her headaches were. R. at 51-52. She stated that she was presently seeing a cardiologist for constant chest pain, a pulmonologist for difficulty breathing, and a chiropractor for her back and neck pain, as well as her family doctor. R. at 40-42, 49. Plaintiff testified that she currently takes blood pressure medication, vitamin D, iron, Provigil, Ritalin, empalax, Symbicort, naproxen, Tylenol, and possibly other medications that she could not remember. R. at 42-43. Plaintiff remarked that the medications made her drowsy and she "could sleep all day." R. at 43.

She described that she typically wakes between 6:30 am and 7:00 am and drives her daughter to the diner where both Plaintiff and her daughter work. R. at 43. Plaintiff works at the diner for two to three hours in the morning for a total of between fifteen and twenty hours per week. R. at 38, 44. At the diner, she makes $7.25 per hour. R. at 38. After working at the diner, she visits her mother around noon, where she rests. R. at 44. In the afternoon, Plaintiff sleeps until between 5:00 pm and 6:00 pm and goes to bed at 8:00 pm. R. at 45. Plaintiff testified that she can dress,

groom, bathe, shop, and cook for herself. R. at 45-46. She also does the dishes, laundry, and sweeps the floors. Id.

The ALJ also sought the opinion of Richard Willette ("Willette"), a vocation expert. R. at 52. Willette testified that an individual limited to unskilled, entry-level work with the ability to lift only light amounts could perform the job of a packer, assembler, or sorter. R. at 55. However, he concluded that Plaintiff would not be able to perform any job because of the amount of time she needs to lay down during the day. R. at 56. When presented with Dr. Shayevitz's evaluation of Plaintiff, the vocational expert determined that given Plaintiff's borderline marked limitation in her low back with respect to lifting, bending, pushing, and pulling; and her tremor and limited extent of motion in her right upper arm and hand, "there would be no past work and no other work a person would be able to do." R. at 56-57.

### 2. Initial Decision

In an opinion issued on October 28, 2009, ALJ John Pope found that Plaintiff's impairments did not satisfy the criteria of Medical Listing 1.04 and her mental impairments did not satisfy the criteria of listings 12.02, 12.04, or 12.05. R. at 79-80. The ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) with the additional limitations that she should only occasionally climb, balance, stoop, kneel, crouch, and crawl; must avoid concentrated exposure to hazards, and is limited to unskilled work. R. at 81. The ALJ found Plaintiff's testimony to be generally consistent with statements Plaintiff submitted to the Record, but found that Plaintiff was inconsistent in how she described her activities of daily living to different consultative examiners. R. at 82. The ALJ also noted that Plaintiff's testimony that she works part time at a diner for fifteen to twenty hours per week was inconsistent

with previous testimony that she was unable to work.  Id.

Plaintiff filed a timely Request for Review with the Appeals Council on December 24, 2009. R. at 129.  On March 18, 2011, the Appeals Council issued an order remanding the case, after finding that the ALJ did not properly evaluate the evidence submitted by Dr. Sullivan, the administrative record was incomplete, and the ALJ failed to fully evaluate Plaintiff's mental impairments.  R. at 86-91.  The ALJ was also instructed to obtain supplemental evidence from a vocational expert if the expanded record so warranted.  Id.

### 3.  Remand Hearing

The remand hearing was conducted in Syracuse, New York on August 19, 2011 by ALJ Ramos.  R. at 18.  At the hearing, Plaintiff provided more information about her prior relevant work, stating that her job at the furniture factory required her to lift pieces fifty pounds and greater and that lifting was a significant activity in this job.  R. at 64.  Plaintiff testified that she was still working for a few hours a day at the diner, and still needed to nap for between three and four hours a day because she was exhausted and had pain and headaches.  R. at 65, 67.  She testified that she gets headaches daily.  R. at 67  Plaintiff also stated that she would soon be resuming physical therapy for her neck and back pain.  Id.  Since her initial hearing, Plaintiff had also been diagnosed with diabetes and was being treated for that condition by Dr. Sullivan.  R. at 69-70.

### 4.  ALJ's Decision

In a decision dated September 15, 2011, ALJ Ramos denied Plaintiff's claim.  R. at 15-26. At step one, the ALJ found that Plaintiff had not performed substantial gainful activity during the period from the alleged onset of her disability on September 1, 2004 through the date she was last insured on December 31, 2009.  R. at 20.  At steps two and three, the ALJ identified Plaintiff's

lumbar and cervical degenerative disc disease, headaches, post concussion syndrome, borderline intellectual functioning, and depressive disorder as "severe" impairments, but found that these impairments did not meet or medically equal the criteria for a listed impairment. R. at 21. Specifically, the ALJ determined that Plaintiff's mental impairments imposed mild limitations on her daily living and social functioning, and moderate limitations on her concentration, persistence, or pace. Id. There was no evidence that Plaintiff had experienced any episodes of decompensation due to her mental impairments and the evidence did not establish the presence of any "C criteria." Id.

The ALJ found that Plaintiff had the RFC to perform a wide range of light work as defined by 20 C.F.R. § 404.1567(b). Id. Specifically, the ALJ found that Plaintiff could lift and carry up to twenty pounds on an occasional basis and up to ten pounds on a frequent basis. R. at 21-22. She could sit for up to six hours total in an eight-hour workday with normal breaks, could occasionally climb ramps or stairs, could occasionally climb ladders, ropes, or scaffolds, and could occasionally balance, stoop, kneel, crouch, or crawl. R. at 22. He noted that Plaintiff should avoid driving or operating dangerous machinery. Id. Additionally, Plaintiff had the RFC to understand and follow simple instructions and directions, perform simple tasks with supervision and independently, maintain attention and concentration for tasks, regularly attend to a routine, maintain a schedule, relate to and interact appropriately with others in carrying out simple repetitive tasks, and handle reasonable levels of stress involving occasional decision making related to the performance of simple repetitive tasks. Id.

At step four, the ALJ found that Plaintiff could not perform her past work as a utility worker or cook. R. at 25. When discussing Plaintiff's work at the diner, the ALJ determined that while this

work "does not rise to the level of substantial gainful activity, considering the claimant's limited work schedule and earnings, it will not be ignored in determining whether the claimant is medically disabled." R. at 20. He found that in light of Plaintiff's age, education, and work history, under the framework set forth in the Medical-Vocational Guidelines, Plaintiff remained capable of performing work that existed in significant numbers in the national economy. R. at 25.

In reaching these conclusions, the ALJ relied on the opinions of Dr. Totero, Dr. Gross, Dr. Seidenberg, Dr. Hughes, and Dr. Noia. R. at 22. The ALJ found that the descriptions of Plaintiff's functional limitations offered by Dr. Shayevitz were too vague to be given significant weight, and that these observations were based mainly on Plaintiff's subjective complaints. R. at 23. The ALJ gave no weight to the State Agency assessment because it is not a medical source opinion. Id.

The ALJ gave Dr. Sullivan's opinions less than controlling weight, finding that Dr. Sullivan's conclusory statements that Plaintiff is disabled were more appropriately reserved for the ALJ to determine. R. at 24. The ALJ found that Dr. Sullivan's opinion as to Plaintiff's cognitive limitations should be given limited weight, as Dr. Sullivan is a primary care physician and not a psychiatrist or neurologist. Id. He also found that Dr. Sullivan's conclusion that Plaintiff is unable to do repetitive activities with her upper and lower extremities, and is unable to bend, lift, and carry, was inconsistent with the findings of several other medical opinions in the record as well as Plaintiff's limited work at a family member's restaurant. Id.

The ALJ also found that Plaintiff's subjective complaints were less than credible. Id. He found that she had not sought ongoing treatment from an orthopedic specialist for her back and neck pain, and that her MRI scans showed only mild degenerative disc disease. Id. As for Plaintiff's complaints of cognitive issues, the ALJ found that she only sought treatment at a mental health

clinic on a few occasions in 2006 and 2007, and that a psychiatrist who examined Plaintiff in 2006 noted that her complaints seemed to be "in excess" of her injury.  Id.

The ALJ found Dr. Totero and Dr. Gross's opinions that Plaintiff could return to work without restriction to be "excessively optimistic," but concluded that most medical opinions in the record support the conclusion that Plaintiff can perform a wide range of light work, with some allowances for nonexertional limitations.  R. at 24-25.  However, he concluded that Plaintiff did not have the RFC to perform any of her past relevant work.  R. at 25.  At the last stage of analysis, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.  Id.  Accordingly, the ALJ concluded that Plaintiff was not disabled under §§ 216(i) and 213(d) of the Social Security Act.  R. at 25-26.  The Appeals Council denied Plaintiff's request for review of the ALJ's decision on April 17, 2013.  R. at 1.  Plaintiff filed a timely appeal on June 4, 2013.  Dkt. No. 1 ("Complaint").

## III.   LEGAL STANDARD

### A.  Standard of Review

When a court reviews an ALJ's final decision, it must determine whether the ALJ applied the correct legal standards and whether the decision is supported by substantial evidence in the record.  42 U.S.C. § 405(g); Roat v. Barnhart, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010) (Kahn, J.) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)).  Substantial evidence amounts to "more than a mere scintilla," and it must reasonably support the decision-maker's conclusion. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  The Court defers to the Commissioner's decision if it is supported by substantial evidence, "even if it might justifiably have reached a different result upon a de novo review."

Sixberry v. Colvin, No. 12-CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)).  However, the Court should not uphold the ALJ's decision when there is substantial evidence to support the decision, but it is not clear that the ALJ applied the correct legal standards.  Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

### B.  Standard for Benefits

According to SSA regulations, disability is "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 404.1505(a).  An individual seeking disability benefits "need not be completely helpless or unable to function."  De Leon v. Sec'y of Health & Human Servs., 734 F.2d 930, 935 (2d Cir. 1984) (quoting Gold v. Sec'y of Health, Educ. & Welfare, 463 F.2d 38, 41 n.6 (2d Cir. 1972)).  In order to receive disability benefits, a claimant must satisfy the requirements set forth in the SSA's five-step sequential evaluation process.  20 C.F.R. § 404.1520(a)(1).  In the first four steps, the claimant bears the burden of proof; at step five, the burden shifts to the SSA.  Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)).  If the SSA is able to determine that the claimant is disabled or not disabled at any step, the evaluation ends.  20 C.F.R. § 404.1520(a)(4).  Otherwise, the SSA will proceed to the next step.  Id.

At step one, the SSA considers the claimant's current work activity to see if it amounts to "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  If it does, the claimant is not disabled under SSA standards.  Id.  At step two, the SSA considers whether the claimant has a severe

13

medically determinable physical or mental impairment, or combination of impairments that is severe, that meets the duration requirement in 20 C.F.R. § 404.1509.  Id. § 404.1520(a)(4)(ii).  If he or she does not have such an impairment, the claimant is not disabled under SSA standards.  Id.  At step three, the SSA considers the severity of the claimant's medically determinable physical or mental impairment(s) to see if it meets or equals an impairment and the requisite duration listed in 20 C.F.R. § 404(P), Appendix I.  Id. § 404.1520(a)(4)(iii).  If it does not, the SSA moves on to step four to review the claimant's RFC and past relevant work.  Id. § 404.1520(a)(4)(iv).  The claimant is not disabled under SSA standards if the RFC reveals that the claimant can perform past relevant work.  Id.  If the claimant cannot perform his past relevant work, the SSA decides at step five whether adjustments can be made to allow the claimant to work somewhere in a different capacity.  Id. § 404.1520(a)(4)(iv).  If appropriate work does not exist, then the SSA considers the claimant to be disabled.  Id.

## IV.    DISCUSSION

Plaintiff argues that the ALJ erred by: (1) not properly following the procedure set forth in 20 C.F.R. § 404.1520a(d)(2) when evaluating Plaintiff's mental disorder; (2) not crediting the opinions of treating physician Dr. Sullivan; (3) determining that Plaintiff was capable of a full range of light work without taking into account Plaintiff's cognitive and without taking vocational expert testimony; (4) failing to properly evaluate the credibility of Plaintiff's testimony.  Pl.'s Br. at 2.

### A.  Whether the ALJ Failed to Properly Evaluate Plaintiff's Mental Impairments

Plaintiff contends that the ALJ did not follow the proper procedure under 20 C.F.R. § 404.1520a(d)(2) when evaluating her mental impairments.  Specifically, Plaintiff argues that "the ALJ erred in not moving on to fully evaluate all of the criteria of listing 12.02" for organic mental

disorders, and consequently, reached the erroneous conclusion that Plaintiff's condition did not meet or equal this listing.  Pl.'s Br. at 8-11.

SSA regulations require the application of a special technique at the second and third steps of the five-step framework for evaluating the severity of mental impairments.  20 C.F.R. § 404.1520a.  Under this technique, the ALJ must first determine whether a plaintiff has a medically determinable impairment and then assess the degree of functional limitation resulting from the impairment in four broad areas: (1) activities of daily living, (2) social functioning, (3) concentration, persistence, or pace, and (4) episodes of decompensation.  20 C.F.R. § 404.1520(a)(c)(3).  Each of the first three areas is rated on a scale of none, mild, moderate, marked, and extreme.  20 C.F.R. § 404.1520a(c)(4).  The fourth is rated on a scale of none, one or two, three, and four or more.  Id.  If the degree of limitation in each of the first three areas is rated mild or better, and no episodes of decompensation are identified, then the impairment is usually not severe and benefits are therefore not warranted.  20 C.F.R. § 404.1520a(d)(1); see also Petrie v. Astrue, 412 F. App'x 401, 408 (2d Cir. 2011); Kohler v. Astrue, 546 F.3d 260, 265-66 (2d Cir. 2008).

The ALJ identified Plaintiff's headaches, post-concussion syndrome, borderline intellectual functioning, and depressive disorder as mental disorders that individually constituted "severe impairments."  R. at 21.  However, the ALJ appears to have evaluated Plaintiff's mental impairments in the aggregate, and did not consider them as separate impairments.  Id.  The ALJ did not provide a separate analysis for each of the identified mental impairments and did not provide any analysis as to how he reached his conclusions, instead stating:

> Consistent with the findings and conclusions of a psychologist who evaluated the
> [claimaint's] mental status on a consultative basis on August 29, 2007 (Exhibit

7F) as well as the opinion of a State Agency medical consultant (Exhibit 9F), the undersigned concludes that the claimant's mental impairments impose mild limitations on her activities of daily living, mild limitations on her social functioning, and moderate limitations on her concentration, persistence, or pace. There is no evidence that the claimant has experienced any episodes of decompensation due to her mental impairments. The evidence does not establish the presence of any "C criteria."

Id. The Court finds that this cursory analysis does not satisfy 20 C.F.R. § 404.1520a. Specifically, 20 C.F.R. § 404.1520a provides:

(4) At the administrative law judge hearing and Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a. While the ALJ mentions that he is relying on the opinions of Dr. Noia and the State Agency medical consultant, and includes a specific finding as to each of the four factors, the ALJ does not include any analysis. Therefore the Court cannot conclude that the ALJ properly considered Plaintiff's significant history, examination and laboratory findings, and functional limitations when reaching his conclusion about the severity of the mental impairment. See Kohler, 546 F.3d at 267-68 (remanding case after finding that meaningful review of the application of the special framework was frustrated by the ALJ's failure to include analysis of the four functional areas for mental impairments). While the Second Circuit in Kohler left open the possibility that failure to comply with 20 C.F.R. § 404.1520a can be harmless error, as the Kohler court reasoned, "the record in this case does not allow us to say that the ALJ's failure here was harmless." Id. at 269. Similarly, the lack of analysis with respect to the special technique findings does not allow the Court to determine whether the ALJ properly considered all evidence relevant to those areas.

16

Moreover, there is significant evidence in the Record of Plaintiff's mental impairments bearing on special technique factors that does not appear to have been considered by the ALJ. Accordingly, the severity of Plaintiff's mental impairments must be remanded for further consideration consistent with 20 C.F.R. § 404.1520a.

### B. Whether the ALJ Erred in Not Giving Controlling Weight to Dr. Sullivan's Opinions

Plaintiff argues that the ALJ abused his discretion in failing to afford controlling weight to the opinion of Plaintiff's treating physician, Dr. Sullivan. Pl.'s Br. at 13-15. Under the "treating physician rule," the opinion of a treating physician is given controlling weight where it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." 20 C.F.R. § 404.1527(c)(2); see also Halloran, 362 F.3d at 31. However, a treating physician's opinion need not be given controlling weight where it is contradicted by other substantial evidence in the record. Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002). "[T]he less consistent [an opinion] is with the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). When an ALJ does not give controlling weight to a treating physician's opinion, then the ALJ must consider the following factors in determining the appropriate weight to assign to the opinion:

> (i) the length of the treatment relationship and the frequency of examination; (ii) the nature and extent of the treatment relationship; (iii) the extent to which the opinion is supported by relevant evidence; (iv) the consistency of the opinion with the record as a whole; (v) specialization; and (vi) other factors.

20 C.F.R. § 404.1527(c)(2). An ALJ is required to explain the weight given to the opinion of a treating physician and must give "good reasons." Snell, 177 F.3d at 133.

In the present case, the ALJ gave Dr. Sullivan's opinions less than controlling weight,

finding that Dr. Sullivan's conclusory statements that Plaintiff is disabled were more appropriately reserved for the ALJ to determine.  R. at 24.  The ALJ found that Dr. Sullivan's opinion as to Plaintiff's cognitive limitations should be given limited weight, as Dr. Sullivan is a primary care physician and not a psychiatrist or neurologist.  Id.  He also found that Dr. Sullivan's finding that the Plaintiff is unable to do repetitive activities with her upper and lower extremities, and is unable to bend, lift, and carry, was inconsistent with the findings of several other medical opinions in the record as well as Plaintiff's limited work at a diner.  Id.

Although some of the factors, such as the length of Dr. Sullivan's relationship with Plaintiff and the nature and extent of treatment weigh in favor of giving his opinions controlling weight, the ALJ adequately explained that Dr. Sullivan's opinions as to Plaintiff's cognitive limitations were given limited weight because he is a primary care physician and not a psychiatrist or neurologist. See 20 C.F.R. § 404.1527(d)(5) (listing specialization as one factor to be considered when assigning weight to a medical opinion).  While Dr. Sullivan's opinions as to Plaintiff's cognitive limitations should not be disregarded given the length and extent of their relationship, it is appropriate in this respect to give his opinion less weight than that given to Plaintiff's treating psychiatrists and neurologists.  The ALJ's decision that Dr. Sullivan's opinion concerning Plaintiff's inability to do repetitive activities with her upper and lower extremities and inability to bend, lift, and carry should be given limited weight because they are contradicted by other evidence in the Record constitutes a "good reason" within the meaning of 20 C.F.R. § 404.1527(d)(2).  The only other physician whose opinion supported Dr. Sullivan's in this respect was that of Dr. Shayevitz, whose opinion was deemed by the ALJ to be "too vague" to be afforded significant weight.  R. at 23.  The Court finds that the ALJ adequately explained his rationale for giving Dr. Sullivan's opinions less than

controlling weight and that it was not an abuse of discretion for him to do so.

Plaintiff's argument that the ALJ erred in failing to fully consider the significant impact of her condition and ignored Plaintiff's lengthy history of "clinical presentation and documentation" essentially restates Plaintiff's arguments that the ALJ should have afforded controlling weight to Dr. Sullivan's opinions. Pl.'s Br. at 16-17. However, the Court finds that the ALJ properly exercised his discretion when weighing conflicting evidence within the record. See Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012) (noting that the court would defer to the Commissioner's resolution of conflicting evidence); see also Matta v. Astrue, 508 F. App'x 53, 56 (2d Cir. 2013) (finding that the ALJ was entitled to weigh all of the evidence to make an RFC that was consistent with the record as a whole).

### D.  Whether the ALJ Erroneously Concluded that Plaintiff Could Perform "Light Work"

Plaintiff argues that the ALJ erred in determining that Plaintiff had the RFC for "light work." Pl.'s Br. at 15-17. In support of this argument, Plaintiff argues that the opinions of Dr. Sullivan and Dr. Shayevitz do not support such a finding. Id. at 15. As previously discussed, it was not an abuse of discretion for the ALJ to assign limited weight to Dr. Sullivan's opinion. Moreover, the ALJ did not abuse his discretion in deeming Dr. Shayevitz's opinion "too vague" to be afforded significant weight. The Court agrees that Dr. Shayevitz's evaluations were based primarily on Plaintiff's subjective complaints and are not corroborated by diagnostic testing.

However, given the errors identified in how the ALJ evaluated the severity of Plaintiff's mental impairments, the Court cannot conclude that his determination as to Plaintiff's RFC is supported by substantial evidence. Accordingly, on remand, the ALJ is instructed to re-evaluate Plaintiff's RFC after properly considering the nature and severity of her mental impairments.

Plaintiff argues that the ALJ failed to consult a vocational expert in step five of the analysis. Pl.'s Br. at 17. The Court declines to determine whether vocational expert testimony was necessary in light of the errors identified in the ALJ's evaluation of Plaintiff's mental impairments.

Under SSR 83-12, the ALJ is not obliged to elicit testimony from vocational experts when a claimant's RFC falls within the categories of the grids. Gravel v. Barnhart, 360 F. Supp. 2d 442, 448 (N.D.N.Y. 2005) ("The purpose of SSR 83-12 is to clarify the use of the Grids as a framework for disability determinations when an individual's exertional RFC does not fall within any of the categories of work as defined in sections 404.1567 and 416.967 of the Regulations."). If the RFC does not fall within an exertional category, the use of Grids "will not be determinative." Id. at 449. An ALJ must then rely on a vocational expert in making a disability determination. Id. An ALJ's failure to elicit testimony from a vocational expert does not constitute an error in the step five determination if the ALJ's RFC determination is supported by substantial evidence. On remand, the ALJ must first consider the opinions of all of Plaintiff's physicians, and then determine whether a vocational expert is required.

**E. Consideration of Plaintiff's Testimony**

Plaintiff argues that the ALJ mischaracterized Plaintiff's testimony regarding her mental ability to work and erred when assessing the credibility of her testimony. Pl.'s Br. at 17-18. Plaintiff contends that the ALJ's statement that "the Claimant's ongoing part-time work performing various duties at a restaurant indicates that she is, and has been, mentally capable of working" is a mischaracterization. Id. at 18. In support of this argument, Plaintiff cites several examples in the Record that highlight how her physical and mental limitations impact her ability to work at the diner that were not mentioned in the ALJ's opinion. Id.

When considering a claimant's symptoms, including allegations of pain, the ALJ must consider "the extent to which [a claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence . . . ." 20 C.F.R. §§ 404.1529(a), 416.929(a). An ALJ is instructed to carefully consider a claimant's individual statements regarding their symptoms with the rest of the evidence in the record in order to reach a conclusion about the credibility of a claimant's statements if a disability determination cannot be made solely on the basis of objective medical evidence. SSR 96-7P, 1996 WL 374186, at *1 (S.S.A. July 2, 1996).

> If an individual's statement about pain or other symptoms are not substantiated by the objective medical evidence, the adjudicator must consider all of the evidence in the case record, including any statements by the individual and other persons concerning the individual's symptoms. The adjudicator must then make a finding on credibility of the individual's statements about symptoms and their functional effects.

Id. at *4. The ALJ determined that Plaintiff's subjective complaints were "less than fully credible." R. at 24. He stated that Plaintiff described a "reasonable daily routine"; taking her daughter to work, working part time at the diner, and going to her mother's house in the afternoon. R. at 24. The ALJ also took note of Plaintiff's testimony that she could take care of her own basic grooming, make simple meals, shop for groceries, and wash dishes. Id. In evaluating the credibility of Plaintiff's testimony, the ALJ considered Plaintiff's MRI scans which showed only mild degenerative disc disease, and noted that Plaintiff had sought only conservative treatment for her back and neck pain, and only sporadic treatment for her headaches and mental impairments. Id.

The Court finds that the ALJ ignored much of the evidence in the Record that corroborated Plaintiff's testimony as to the debilitating effects her post-concussion syndrome and headaches have on her daily routine. In describing Plaintiff's daily routine, the ALJ ignored Plaintiff's testimony that she can only work a few hours at a time before needing to sleep, or that she experienced

significant pain when standing for more than a few hours. The ALJ largely ignores Plaintiff's testimony about the persistence and frequency of her headaches. While the ALJ is not required to find Plaintiff's testimony credible, the ALJ failed to consider and evaluate Plaintiff's statements about the intensity, persistence, and functionally limiting effect of Plaintiff's testimony regarding her symptoms in accordance with SSR 97-P and 20 C.F.R. § 404.1529(c)(1). See Robinson v. Colvin, No. 14 CV 683, 2015 WL 4759068, at *3 (D. Conn. Aug. 12, 2015) (stating that an adjudicator is required to evaluate a claimant's testimony regarding symptoms where those symptoms are corroborated by objective medical testimony under the framework set forth in SSR 96-7P). With respect to Plaintiff's complaints about back and neck pain, the Court finds that the ALJ's decision that Plaintiff's testimony was not credible is supported by substantial evidence. In reaching this conclusion, the ALJ relied on the MRI scans, which showed signs of only mild degenerative disc disease. R. at 24. This was further corroborated by Plaintiff's psychiatrist, who noted that her complaints seem to be "in excess of her injury." R. at 24. Accordingly, the ALJ's decision as to the credibility of Plaintiff's testimony with respect to Plaintiff's back and neck pain is affirmed, but the credibility assigned to Plaintiff's testimony regarding the limitations imposed by her headaches and post-concussion disorder are remanded for further analysis consistent with SSR 96-7P.

## V.      CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the decision of the Commissioner is **VACATED and REMANDED** for further proceedings consistent with this Memorandum-Decision and Order; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and

22

Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:        March  18, 2016
              Albany, New York

_____
                                        Lawrence E. Kahn
                                        U.S. District Judge